**George ELDRIDGE, Plaintiff,**

v.

**James MORRISON, et al., Defendants.**

**Civil Action No. 95–C–905–N.**

United States District Court,
M.D. Alabama,
Northern Division.

June 4, 1996.

David George Flack, Montgomery, AL, for Plaintiff.

Ellen Ruth Leonard, Andrew W. Redd, Alice Ann Byrne, Alabama Dept. of Corrections, Legal Div., Montgomery, AL, for Defendants.

### MEMORANDUM OPINION AND ORDER

CARROLL, United States Magistrate Judge.

### I. INTRODUCTION AND PROCEDURAL HISTORY

On July 3, 1995, the plaintiff, George Eldridge (Eldridge), a black male, filed this action against James Morrison (Morrison; former warden at Staton Correctional Institution), Morris Thigpen (Thigpen; former Department of Corrections Commissioner), and Ron Jones (Jones; Department of Corrections Commissioner),[1] in their individual and official capacities, and against the Department of Corrections. He alleged that he had been discriminated against on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.* as amended (Title VII race claim). Specifically, he claimed that he was disciplined more harshly than white officers.

On October 24, 1995, he amended his complaint to include J.D. White (White; former warden at Staton Correctional Facility and former Deputy Commissioner) and Tommy Herring (Herring; former Department of Corrections Commissioner) as defendants in their individual and official capacities.[2] He also added additional claims (1) that he was terminated due to race discrimination and retaliated against for filing a complaint with the Equal Employment Opportunity Commission, in violation of Title VII (Title VII retaliation claim)[3]; (2) that he faced race discrimination and retaliation in violation of his rights under 42 U.S.C. § 1983 (§ 1983 claims); (3) that he faced a conspiracy to deprive him of his rights under 42 U.S.C. § 1985 (§ 1985 claim); and (4) that certain defendants did not prevent the conspiracy in violation of 42 U.S.C. § 1986 (§ 1986 claim).[4]

This cause is currently before the court on a Motion for Summary Judgment filed by all of the defendants on March 7, 1996. They argue that Eldridge failed to offer sufficient evidence of a prima facie case of discrimination, conspiracy or retaliation; that they are entitled to qualified and absolute immunity for the § 1983 claims; and that not all defendants are employers within the meaning of Title VII. Eldridge responded to this Motion on April 16, 1996.

The court held an oral argument on the Motion for Summary Judgment on May 8, 1996. On May 24, 1996, over two months after the deadline for submitting evidentiary materials opposing a motion for summary judgment, Eldridge filed a Motion to Allow Filling (sic) of Additional Documents Ob-

---

1. Jones has been replaced by Hopper as Commissioner.

2. During the oral argument held on May 8, 1996, both sides brought to the court's attention the fact that certain defendants were not with the Department of Corrections during the times when the alleged violations occurred. After oral argument, the court contacted both sides, who agreed that the following defendants were with the Department of Corrections in these capacities during these time periods:

 *James Morrison* Position: Warden at Staton Dates: February 27, 1988—December 30, 1993
 *Morris Thigpen* Position: Commissioner of Corrections Dates: February 2, 1987—May 5, 1993
 *Tommy Herring* Position: Commissioner of Corrections Dates: May 5, 1993—November 12, 1994
 *Ron Jones* Position: Commissioner of Corrections Dates: February 4, 1995—April 27, 1996

 *J.D. White* Position: Warden at Staton Dates: February 5, 1994—February 13, 1995
 Position: Deputy Commissioner of Corrections Dates: February 13, 1995—March 29, 1996

3. Eldridge also alleges that he was retaliated against for filing an affidavit in another law suit against different defendants; namely, the DOC Personnel Board. Since the outcome is the same whether the alleged retaliation occurred as a result of the affidavit, the EEOC charge, or both, the court simply refers to the EEOC charge.

4. As a preliminary matter, the court notes that there is some question as to whether some of Eldridge's claims are time barred. It is difficult to answer this question given the disorganized nature of the evidence before the court and the unintelligible statements of counsel. Rather than deciding this question—a feat which, given the state of this case, would use far too many judicial resources—the court instead discusses the merits of all of Eldridge's claims.

tained After Filing of Plaintiff's Response to Defendants (sic) Motion for Summary Judgment, which had 14 documents attached. Although the court strongly disapproves of the timing of this Motion, the court nonetheless has granted the Motion so that it may discuss these documents below. It is the court's wish that the plaintiff benefit from a complete analysis of this case. In addition, the court notes that these documents are part of the Department of Corrections file, and were thus known by the defendants before they were submitted to this court. The court has fully considered the evidence and legal arguments presented by all parties.

## II. FACTUAL BACKGROUND

The court has carefully considered all documents submitted in support of and in opposition to the Motion for Summary Judgment. The submissions, viewed in the light most favorable to the non-movant, establish the following facts: [5]

The plaintiff, Eldridge, is an African American male who has been employed by the Department of Corrections for sixteen years as a correctional officer. In opposition to the Motion for Summary Judgment, Eldridge submitted yearly job performance evaluations for the yearly periods of 1984–1987, 1987–1988, 1989–1990, and 1991–1994. He received "exceeds standards" ratings on all of these evaluations. During his sixteen years of service, however, he also received several disciplinaries. Two of these disciplinaries formed the bases of two Charges of Discrimination which he filed with the Equal Employment Opportunity Commission (EEOC). In the first charge filed in 1993, he stated that Morris Thigpen suspended him for five days for "Failure to exercise courtesy and tact." Eldridge claimed that he was suspended because of his race in that a white correctional officer who repeatedly violated the same policy he was accused of violating had never been suspended. After receiving an unfavorable determination from the

EEOC, Eldridge received a Right to Sue letter. In 1995, Eldridge filed a second Charge with the EEOC stating that he was terminated for "Failure to exercise courtesy and tact." He alleged that he was terminated in retaliation for filing the 1993 EEOC charge and because he is African American. Eldridge also made general allegations of discriminatory practices and patterns within the DOC.[6] Eldridge has requested a Right to Sue letter, and has provided documentation to the court from the EEOC indicating that a letter is forthcoming.

## III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of demonstrating to the court the basis for his motion and identifying those portions of the pleadings and evidentiary submissions which he believes show an absence of any genuine issue of material fact. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1993), *reh'g denied*, 16 F.3d 1233 (11th Cir.1994). In a case in which the ultimate burden of persuasion at trial rests on the nonmovant, the party seeking summary judgment can meet this standard either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to his claims, and on which he bears the burden of proof at trial. *Id.* To satisfy this burden, the

---

5. The defendants filed a Motion to Strike certain portions of affidavits filed by Mr. Eldridge. The court has considered these affidavits in full in reaching its decision in this case, and finds that they contain no evidence which is useful to Mr. Eldridge's claim.

6. Eldridge appealed his termination to the Personnel Board which subsequently reinstated him.

nonmovant cannot rest on the pleadings, but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir.1987). It is the substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986); *see also DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990).

When the court considers a notion for summary judgment, it must avoid weighing conflicting evidence, making credibility determinations, and deciding any material factual issues. *Hairston,* 9 F.3d at 919. All the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

With these rules and principles of law in mind, the court will determine whether summary judgment is appropriate or whether there exist genuine issues of material fact that should properly proceed to trial for resolution.

## IV. DISCUSSION

### A. The Title VII Claims

The defendants raise three issues which concern the viability of Eldridge's Title VII claim in their Motion for Summary Judgment. First, they argue that they are not all liable as Eldridge's "employer." Next, they question whether Eldridge established a prima facie claim of race discrimination. Finally, they challenge the sufficiency of evidence in support of Eldridge's prima facie claim of retaliation.

### 1. Who is an Employer under Title VII

Although the defendants raised the issue that they are not all employers liable under Title VII, they did not address it in their brief. As such, the court interprets the issue to be whether any defendants may be held liable under Title VII, and in what capacity may they be held liable.

■ For many years, the Eleventh Circuit held that agents of an employer may not be sued in their individual capacities under Title VII. *See Busby v. City of Orlando,* 931 F.2d 764 (11th Cir.1991). In *Cross v. Alabama,* 1994 WL 424303 (11th Cir. Aug.30, 1994), however, the court appeared to hold that an employee who is deemed an agent of the employer under Title VII may be sued in his individual capacity. Shortly thereafter, the Eleventh Circuit clarified its position in an opinion in the same case, reaffirming *Busby* and concluding that individual capacity suits were inappropriate under Title VII. *Cross v. Alabama,* 49 F.3d 1490 (11th Cir.1995). Therefore, summary judgment as to Title VII claims against defendants Morrison, Thigpen, Herring, Jones, and White, in their individual capacities is due to be GRANTED.

### 2. Prima Facie Case of Race Discrimination

The defendants argue that they are entitled to summary judgment on Eldridge's Title VII race discrimination claim because Eldridge has failed to proffer legally sufficient evidence.

A Title VII plaintiff who wishes to bring a claim for disparate treatment can bring a suit on either direct or circumstantial evidence. *See E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920 (11th Cir.1990). "In a direct evidence case, a plaintiff must produce direct testimony that the employer acted with discriminatory motive, and must convince the trier of fact to accept the testimony." *Id.*

Such direct evidence can be comprised of statements by supervisory employees which display race bias. *Id.* Eldridge does not attempt to prove his claim by direct evidence. Thus, the court will examine whether circumstantial evidence of disparate treatment exists.

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth one method of establishing a prima facie Title VII case utilizing circumstantial evidence.[7] The Court has made it clear, however, that its formulation was not meant to be exclusive, and that a prima facie case of disparate treatment may be established in a number of ways. *See, e.g., United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983) (prima facie case method never intended to be rigid, mechanistic, or ritualistic). In *Jones v. Gerwens,* 874 F.2d 1534 (11th Cir. 1989), the Eleventh Circuit set forth a standard where,

> in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Id.* at 1540.

 Eldridge seeks to prove intentional discrimination by the latter method. When reviewing whether a plaintiff has made out a prima facie case based on this latter method, "courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." *Id.* Thus, this court will closely focus on which supervisors Eldridge names. In addition, "plaintiff must show that employees

are treated differently for 'nearly identical' conduct." *Cabiness v. YKK (USA), Inc.,* 859 F.Supp. 582 (M.D.Ga.1994) (citing *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181 (11th Cir.1984)).

Since Eldridge has proved that he is a member of a protected class, the only issue before the court is whether he provided evidence that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct. Although his response to the summary judgment motion is disjointed and confusing, the court gleans two examples of misconduct for which Eldridge alleges that he was disciplined more severely than white correctional officers. One occurred in 1993 and the other in 1995. The court will discuss both of these incidents.

### a. The 1993 Incident

The following facts describe the incident which formed the basis of Eldridge's 1993 complaint to the EEOC. They are taken from Eldridge's January 24, 1996 deposition.

On January 7, 1993, a black female corrections officer, Velma Brewer (Brewer), was working at the Staton Correctional Facility cafeteria. A white male officer, Lee Allan Bush (Bush), approached her, threw a clipboard toward her (in a non-assaultive manner), put his finger in her face, and called her a bulldagger in front of several inmates. When Eldridge learned of the incident, he asked Bush why he put his finger in Brewer's face in front of inmates. Bush said that it was because Brewer was wrong. Eldridge then stated to him "you think of any situation that you can that would make you right and me wrong, then come to me in that manner and put your hand in my face.... I would not only break you hand, but I would break your face." Eldridge received a five day suspension for "failure to exercise courtesy and tact."

7. "The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (I) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employ-er was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from person of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. at 1824.

In his EEOC Charge, Eldridge states that a white officer who repeatedly violated the same policy "has never been suspended." Before his May 24, 1996 submission of fourteen documents, the only documentation before the court which discussed the conduct of this white officer is Eldridge's deposition, which was submitted by the defendants.

In his deposition, Eldridge states that the white officer he referred to is Bill Haynes (Haynes). Eldridge then proceeds to describe several incidents involving Haynes. As to the first incident, Eldridge stated,

> He was involved in an incident involving a black female where he said to her in the presence of others that she's the type of officer who would drop her drawers for a convict.... That was brought to the attention of the supervisor's as far, I understand, as a captain. And nothing was done about that.

(pp. 32–33). Later in his deposition, Eldridge states that Smith reported the incident to her supervisors, none of whom are defendants in this case. There are several problems with Eldridge's allegation which prevent the court from relying on it as proof to support his race discrimination claim. For example, no defendants are mentioned in Eldridge's submission in connection with this incident, let alone Thigpen, who was the defendant referenced by Eldridge in his EEOC charge. Thus, there is no way for the court to properly compare this example to the discipline of Eldridge which he claims was racially motivated. Without "specific facts showing that there is a genuine issue for trial," plaintiff's allegations cannot stand. Fed.R.Civ.P. 56(e).

In his next example of a situation where Bill Haynes allegedly engaged in the same conduct as plaintiff but was not suspended, as alleged in his EEOC charge, Eldridge states,

> There was another incident when he and a black male were standing outside—or it was right at shift change, and he and this officer exchanged verbal—had some verbal disagreement there. And in fact, they

went as far as to push and shove each other. They were taken to the deputy warden at that time, who was Randall Lucas and were told to go back and go to work. And—okay. The black female's name was Lola Smith.[8] The black male officer's name was—I don't know his first name. His last name was Rogers.

(p. 33) Later in his deposition, Eldridge states that neither man was written up for his incident. At a minimum, the court finds the same problems with this description. Eldridge has failed to tie this supposed disparate treatment to any defendant in this case. This example is far too vague to support Eldridge's disparate treatment allegations.

Eldridge then discusses a third and final incident where Haynes received a letter of reprimand for his conduct.

> This incident involved him looking into an Jet magazine in the shift office in the presence of a black male officer and a black female officer. This female—he said—they were looking at like the centerfold in a Jet magazine, and there were three black females in bathing suits. And he said to the male officer, quote: I wouldn't fuck either one of them with your dick.... The black female was offended ... and brought charges. On this instance only did he receive a letter of reprimand.

(pp. 33–34) The court finds the same problems with this description. It is vague, general, and completely non-specific.

Without evidence concerning the time frame of these incidents or the supervisors involved, there is no way to compare any of Haynes' conduct to the conduct for which Eldridge was suspended. Not only do the descriptions given by Eldridge not provide names of supervisors, but they also do not link any of the defendants to the incidents. In addition, they do not mention Thigpen, whom Eldridge fingered as the defendant responsible for his 1993 suspension.

In his May 24, 1996, Motion, Eldridge discusses and provides five documents relating to Haynes and four relating to himself.

---

8. Although it is unclear, the court believes that in naming Lola Smith, Eldridge is naming the black female from the previous example whom Haynes stated is the type of officer who would drop her drawers for a convict.

Although these documents shed more light on the issue of disparate treatment of Eldridge's 1993 disciplinary, they are still not sufficient to overcome Eldridge's burden for opposing a Motion for Summary Judgment.[9]

Attachment II to Eldridge's Motion for May 24, 1996, indicates that Haynes received a letter of reprimand on from Morrison June 21, 1992 for Failure to Use Courtesy and Tact.[10] According to the evidence before the court, Haynes received this letter after two previous disciplinaries. According to attachment III, Haynes received a 5 day suspension for fraternizing with a prisoner in 1990. According to attachment V, he received a 10 day suspension, a demotion, and a salary reduction for falsification of documents in 1987.

■■■ the court understands Eldridge's charge, he alleges that he received a 5 day suspension for Failure to use Courtesy and Tact whereas Haynes only received a letter of reprimand for Failure to Use Courtesy and Tact, even though Haynes had previous disciplinaries. The court finds that even with the evidence Eldridge submitted on May 24, 1996, Eldridge has failed to make a sufficient showing to survive the Motion for Summary Judgment for at least two reasons. First, Eldridge and Haynes were not similarly situated when Haynes received a letter of reprimand but Eldridge received a five day suspension for Failure to Use Courtesy and Tact. According to the evidence before the court, Haynes had received two disciplinaries prior to this letter. Eldridge, however, had received at least thirteen prior disciplinaries

for various offenses such as tardiness, security violations, and failure to report to work. His punishments ranged from counseling sessions to oral reprimands to suspensions.

■■■ In addition, Eldridge has not provided to the court any evidence which would explain what the misconduct was behind Haynes' disciplinary which prompted the DOC to give him only a letter of reprimand. For all the court knows, Haynes committed very minor misconduct, and rightfully deserved less of a punishment than Eldridge received when he failed to use courtesy and tact. The court does note that Haynes received a letter of reprimand for the last of the three incidents which Eldridge describes in his deposition (see p. 935, above). Since Eldridge provided no time frame for that incident, however, the court cannot be certain that it is the same misconduct as that referenced in attachment II or that it occurred after Haynes' two previous disciplinaries. The court refuses to make these connections for the plaintiff.[11] Eldridge has, simply, failed to meet his burden of proof. As the Eleventh Circuit has noted, the burden is on Eldridge "to show a similarity between [his] conduct and that of white employees who were treated differently and not on [the defendant] to disprove their similarity." *Jones v. Gerwens*, 874 F.2d at 1541 (quoting *Tate v. Weyerhaeuser*, 723 F.2d 598, 603 (8th Cir.1983), *cert. denied*, 469 U.S. 847, 105 S.Ct. 160, 83 L.Ed.2d 97 (1984)).

■■■ Based on Eldridge's deposition, the court believes that Eldridge is referring to

9. Although no evidence has been provided to the court to clarify this issue, the court gathers from the scant evidence before it that different disciplinaries may issue for the same offense based on the number of prior disciplinaries an officer has received. Since this issue is not dispositive, the court is not concerned that its assumption may not be accurate. Even if this is not the case, the court has shown why Eldridge has failed to support his claim for other reasons.

10. Although Morrison and Thigpen (Thigpen was the defendant in Eldridge's 1993 charge) are not the same supervisor, they were warden and commissioner respectively when Haynes received this disciplinary and Eldridge received the disciplinary he complains of in his 1993 charge. There is scant evidence before the court regarding how a correctional officer receives a disciplinary.

Without more, the court cannot assume that Eldridge and Haynes were disciplined by the same supervisor. However, for the sake of completeness and to further its explanation to the plaintiff as to why he did not meet his burden, the court does not stop its analysis of these documents at this point. As will become evident, even if it were the same supervisor who disciplined Eldridge and Haynes—a fact unclear to the court—Eldridge's claim still cannot survive because the two men were not similarly situated when they received the disciplinaries.

11. The court points out that even if these are the same incidents, the court still finds that Eldridge has not met his burden because he has failed to prove that he and Haynes were similarly situated when they were punished differently for failing to use courtesy and tact.

Haynes as the white officer he names in his EEOC charge. In several of his affidavits, however, Eldridge complains that the white officer who was involved in the incident for which he was suspended for five days, Lee Allan Bush, received a lesser disciplinary than he did. On the chance that this is the white officer to whom Eldridge refers, the court will discuss Eldridge's claim in relation to the treatment which Bush received.

In his complaint and supporting documents, Eldridge contends that while Morrison recommended that he receive a five day suspension for failure to use courtesy and tact, he recommended that Bush receive only a ten day suspension for sexual harassment, a more serious charge. He states that while he received the maximum possible punishment for his violation, Bush received the minimum possible punishment for his offense of sexual harassment. Although Eldridge at least states that Morrison was the disciplining supervisor in both incidents, his claim must fail because the nature of the conduct is not similar. Failure to exercise courtesy and tact is not the same violation as sexual harassment. More importantly, in his deposition, Eldridge admits that (a) he does not know if Bush has any prior disciplinaries [12], (b) a ten day suspension is not the maximum punishment for sexual harassment, and (c) he has no idea what Bush was actually charged with, and only "speculated" that it was sexual harassment. (pp. 126–131) Even if Bush is the white officer, Eldridge fails to establish a prima facie case of race discrimination.[13]

For all of the above reasons, the court finds that Eldridge has failed to make a prima facie case of disparate treatment based on his 1993 complaint.

### b. The 1995 Incident

The following facts describe the incident which formed the basis of Eldridge's 1995 complaint to the EEOC. They are taken from Eldridge's January 24, 1996 deposition.

On January 26, 1995, Captain Robert Sanford (Sanford) (white male) and Lieutenant Jeffrey Williams (Williams) (black male) entered the dormitory where Eldridge was in charge for a routine inspection. According to Eldridge, Sanford told Eldridge that the beds were not made perfectly, and that he would "stay on [his] back" until they were perfect. Eldridge responded that they would never be perfect as long as they were man-made. Sanford then stated that "I'm your captain, and when I tell you to do something, I expect for you to do it." At this point, Eldridge and Sanford realized that an inmate was in the room with them, and the captain told him to leave. Once the inmate left, Eldridge told the captain, "do you realize that I bust my ass in this dorm just to make sure that even if the commissioner comes in here the only thing he could say to me is that this is a damn good looking dorm." Eldridge, Sanford, and Williams then had a further verbal interchange, and Eldridge was written up several days later. Due to this incident, Eldridge's termination was recommended based on "failure to use courtesy and tact." Defendant J.D. White handed him the termination papers.

■ As stated above, in order to establish a prima facie case of race discrimination, Eldridge must demonstrate that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct. The court has carefully scrutinized all of Eldridge's supporting documents, and cannot find any situation in which Eldridge has alleged that white officers with similar disciplinary histories who engaged in similar misconduct received less severe disciplinary measures for "failure to use courtesy and tact" at the hands of any defendants. Without any such offer of proof, his claim in

---

**12.** As stated above, the number of prior disciplinaries may have an impact on the punishment an officer receives.

**13.** In his May 24, 1996, supplemental pleadings, Eldridge submits a Corrective Action History Record for Bush. It shows that Bush received a 10 day suspension on February 23, 1993 for

Failure to render efficient and industrious service. First, the court is unsure if this disciplinary relates to the 1993 incident in Eldridge's charge. Even if it does, however, it would not change the outcome of the court's decision since Bush was not charged with Failure to Use Courtesy and Tact.

nothing more than a conclusory allegation, and must fail. *See Robertson v. Georgia Dept. of Corrections, Waycross Probation Office,* 725 F.Supp. 533 (S.D.Ga.1989).

In his 1995 charge, Eldridge also makes "General Allegations of Discriminatory Practices and Patterns." He describes three such situations. First, he states that "the officials of the Department of Corrections are charging Black Officers (sic) with violation of minor offenses on a regular basis and not charging white officers with minor offenses. When a Black (sic) officer makes a claim that a white officer received less of a punishment for a major offense or repeated minor offenses than the black officer, the Department of Corrections Officials are than (sic) using the minor offense records to distinguish the cases." These general allegations are of no benefit since Eldridge has offered no evidence in support of his contention. He does not explain how/if this occurred to him, who the supervisor was, and how/if this occurred to any white officer.

Second, Eldridge alleges that "another method of discrimination is the 'set up.' When White (sic) supervisors receive information that a black officer may violate one of the hundreds of Department of Corrections regulation (sic), the white supervisor encourages the black officer to continue his course of action or does not notify the black officer that his continued course of action will result in a violation of a regulation, the white supervisor than brings a disciplinary action against the black officer. White officer (sic), on the other hand, are informed before hand not to continue the course of conduct." Eldridge offers no evidence, however, that this happened to him or to other black officers, or did not happen to white officers. No pattern or

practice is established by the evidence. The general statements are insufficient. Once again, based on a lack of proof, these simple allegations are insufficient to allow Eldridge's claims to survive summary judgment.

Third, Eldridge states that "another version of the set-up is to falsely criticize the black employee as to the performance of his duties and when the black officer protests, the white supervisor brings a disciplinary action for failure to use courtesy and tact." The court presumes that Eldridge is referring to his exchange with Sanford. Since he has offered no evidence beyond this one situation of a pattern or practice of discrimination, however, these general allegations provide him no assistance.

For all of the above reasons, the court finds that the remaining defendants' Motion is due to be GRANTED on the Title VII race discrimination claim.[14]

### 3. Prima Facie Case of Retaliation

The defendants also argue that they are entitled to summary judgment on Eldridge's Title VII retaliation claim because Eldridge has failed to proffer legally sufficient evidence.

■ Eldridge's Title VII retaliation claim is separate from his Title VII race claim. *See* 42 U.S.C.A. § 2000e–3(a). To recover for retaliation, a plaintiff "need not prove the underlying claim of discrimination which led to [his] protest," so long as he had a reasonable good faith belief that the discrimination existed. *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491 (11th Cir.1989). It is clear in this case that Eldridge has a

14. The court has carefully reviewed all of the evidence which Eldridge submitted on his behalf. The court has only found one example in which Eldridge has properly presented disparate disciplinary evidence. It concerns Morrison disciplining Eldridge more harshly than a white officer for tardiness. Eldridge did not name this incident in either of his EEOC charges. Evidence of this incident could conceivably be used, at trial, to support the claims of race discrimination that Eldridge makes in this complaint. Those claims, however, cannot survive summary judgment because Eldridge has failed to make out a prima facie case on these claims.

The court has not found any other clearly supportive evidence within the documents submitted by Eldridge. Most of the allegations are vague and conclusory. Many of the allegations do not relate to Eldridge himself. Most of the allegations fail to name the supervisor who allegedly inflicted different disciplinary actions. And most of the allegations fail to show similar misconduct by the officers.

Simply, Eldridge offers no viable evidence in support of his claim.

good faith belief that race discrimination existed within the Department of Corrections.[15]

■ To establish a prima facie case of retaliation, a plaintiff must show (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relation between the two events. *Meeks v. Computer Associates Int'l*, 15 F.3d 1013 (11th Cir.1994). The court finds that Eldridge has satisfied the first two prongs of this test. He filed an EEOC charge and was terminated.[16] Thus, the issue before the court is whether there is a causal relation between these events.

■ The Eleventh Circuit recently held that "in order to establish the requisite 'causal link' required as part of a prima facie case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith v. City of Atmore*, 996 F.2d 1155 (11th Cir.1993). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Id.* Eldridge does not specifically state who was responsible for terminating him in his 1995 EEOC charge. At oral argument, he alleged that the DOC and all of its officials who are named as defendants were responsible. In his complaint, he alleges that White, Herring, and Jones were responsible for terminating him. In his deposition, he states that White was responsible. In his affidavit, he says that White and Thigpen are responsible. Eldridge's absolute confusion about his retaliation claim seriously undermines its validity.

As a threshold matter, Morrison and Jones are not mentioned in any of the supporting documents in relation to Eldridge's termination. In addition, neither Thigpen nor Herring was a DOC employee in 1995, when Eldridge was terminated. White, on the other hand, was Deputy Commissioner of Corrections on February 24, 1995, the date Eldridge was terminated. Yet, Eldridge has not provided any support for his allegation that White knew of his 1993 EEOC charge at the time he was terminated. Indeed, White was not the warden at Staton until February 5, 1994—*after* the 1993 EEOC charge was filed. And, White was not named in the EEOC charge. In sum, Eldridge has presented no evidence to show that any defendant who participated in his termination knew of his EEOC complaint. He has thus failed to make the minimum showing necessary to avoid summary judgment on his retaliation claim.

In addition to failing to prove a causal link by means of knowledge, Eldridge has failed to prove that his filing of the EEOC charge and his termination were not wholly unrelated. First, in his deposition, Eldridge states that Sanford, the captain who charged him with failure to use courtesy and tact—the charge for which termination *was* recommended—is "basically laid back" except when he has personal problems, and that aside from the incident in question and one other incident, he is "laid back" and easy going. Eldridge stated that his interchange with Sanford was "unusual." When asked why it may have occurred Eldridge stated, "the only thing that dawned on me was maybe he's again having personal problems."

As to Williams, the lieutenant who was present when Eldridge failed to use courtesy and tact to Sanford, Eldridge alleges that in the November following his August, 1993 EEOC charge, Morrison assigned Williams to monitor him because he knew that Williams did not like him. Eldridge has provided no evidence to support his assumption. It is mere speculation, and is not useful to support his claim. Eldridge also alleges that Williams was instrumental in his termination. From his deposition, the court gathers that Williams wrote a statement about the events leading to Eldridge's termination. This statement, however, is not before the court. In addition, there is no evidence that Williams disciplined or participated in the

---

15. The court does not doubt Eldridge's belief; rather, it finds that he has offered no evidence in support of his belief.

16. The facts surrounding Eldridge's termination are the same as those in his 1995 EEOC charge. Although Eldridge was terminated, he was later reinstated. Thus, he is currently an employee with the Department of Corrections.

discipline of Eldridge until he was terminated. Indeed, Eldridge stated in his deposition that from the time of his 1993 EEOC charge until his termination, he received no disciplinary action. Eldridge complains that Williams gave him an evaluation in November, 1994, which was lower than it should have been, and that White sustained the evaluation. Eldridge surmised that this was retaliatory. Since Eldridge received the same evaluation from Williams as he has from every other supervisor, however, the court does not accept Eldridge's assumption as proof of retaliation.[17]

As to White, Eldridge made several statements in his deposition which disprove his allegations that White retaliated against him. He stated that White encouraged him to seek a promotion, and told him that he should make captain before Williams. He described a situation where Williams wanted to charge him for four hours of leave without pay, and White sided with him (Eldridge) in mid-August, 1994. He described another situation when his Lieutenant (unnamed) would not let him take time off from work, he went to White, White told him to have the Lieutenant contact him, and the Lieutenant, in turn, gave him the time off.[18] Finally, in his affidavit, Eldridge states that White ordered Sanford and Williams to inspect his dorm on a daily basis. He then writes, "previously, captain Sanford and Warden White had encouraged me to reply to criticism and make suggestions. I had always used straight talk to express my views to both of them." Although it is certainly not clear, the court takes this to be a complaint that Eldridge was told to verbalize his complaints, but then was punished when ·he did so during the incident in question. Since Eldridge is not alleging that he was encouraged to complain before the filing of his 1993 charge and written up after the filing of his charge for the same conduct, however, this allegation does not assist his claim.[19] Although Eldridge alleges that White retaliated against him, he has simply offered no evidence to support his claim.

When asked at his deposition whether he had any evidence to support his retaliation claim or whether it was his belief that he was retaliated against, Eldridge stated, "well, it's a common belief in the penal system that if you file complaints, be it grievance, EEOC, what have you, then you become a targeted individual." This basically sums up the extent of Eldridge's supporting evidence for this claim. As a result, he has not established a prima facie case, and summary judgment is due to be GRANTED for the Title VII retaliation claim.

### B. The § 1983 Claims

#### 1. General Requirements for Claims under § 1983

██ Eldridge seeks relief pursuant to 42 U.S.C. § 1983. Section 1983 provides a private cause of action for persons whose rights under the federal constitution or laws have been violated under color of state law. *See* 42 U.S.C. § 1983. In order to establish a claim under § 1983, Eldridge must prove that the defendants acted under the cloak of state authority when they took the alleged actions against him, and that the actions deprived him of a right or rights secured by the Constitution or by federal law. Thus, § 1983 is not a source of rights; rather, it is a means of vindicating federal rights. *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). When a court begins to analyze a § 1983 claim, it must first "identify the specific

---

**17.** Williams evaluated Eldridge as "exceeds standards." Eldridge filed a rebuttal to this evaluation. He complained that since his "count" was only off twice, the category for "count" should have been higher than it was. Eldridge did not offer any hard evidence, however, that he should have been evaluated higher in the "count" category. For example, he did not offer evidence that other officers whose count was off for two or more times received a higher evaluation. Instead, he only offered his belief that his evaluation should have been higher. That Eldridge believes that his evaluation in the "count" cate-

gory should have been higher does not mean that it should have been. Thus, there is no evidence that the "count" evaluation was lowered for retaliatory reasons.

**18.** Without a name or a date, the court has no way or knowing who "the lieutenant" is.

**19.** Indeed, Eldridge did not receive any disciplinary action between the filing of the 1993 charge and his termination.

constitutional right allegedly infringed." *Id.* Whether a constitutional violation has occurred can only be determined by applying the standards applicable to that particular constitutional provision. *See Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Eldridge alleges deprivations of his Fourteenth Amendment right to equal protection of the law based on race discrimination and retaliation.

 The Eleventh Circuit recently maintained that "no established right exists under the equal protection clause to be free from retaliation," and reversed a denial of qualified immunity on that ground. *Ratliff v. DeKalb County, Georgia,* 62 F.3d 338 (11th Cir.1995). Thus, the defendants' Motion for Summary Judgment as to the § 1983 equal protection/retaliation claim is due to be GRANTED. However, in the interests of justice, the court will interpret Eldridge's retaliation claim as a claim alleging deprivation of his First Amendment right to freedom of speech and discuss it.[20]

## 2. Claims Against DOC Defendants in their Individual Capacities

Eldridge brings suit under 42 U.S.C. § 1983 against Thigpen, Morrison, Jones, Herring, and White in their individual capacities. Each of these defendants has claimed that qualified immunity protects them from Eldridge's claims and that they are entitled to summary judgment.

### a. Qualified Immunity

An individual defendant who is being sued personally for actions that he took while acting under color of state law may raise the issue of qualified immunity. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is a question of law to be decided by the court prior to trial. It is designed to allow officials who are entitled to qualified immunity to avoid the expense and disruption of going to trial, and is not merely a defense to liability. *Ansley v. Heinrich,* 925 F.2d 1339 (11th Cir. 1991). As the Eleventh Circuit explained,

[t]hat qualified immunity protects government actions is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities. Unless a government agent's act is so obviously wrong, in the light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit. Because qualified immunity shields government actors in all but the exceptional cases, courts should think long and hard before stripping defendants of immunity.

*Lassiter v. Alabama A & M Univ. Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (citations omitted).

The Supreme Court established a qualified immunity analysis which examines the objective reasonableness of the actions of the state official. *Harlow,* 457 U.S. at 815–19, 102 S.Ct. at 2736–39. Under this test, public official performing discretionary functions which would objectively appear to be within the official's authority have qualified immunity if their challenged conduct did not violate a clearly established constitutional right of which a reasonable person would have known, given the circumstances and information possessed by the official at the time of the conduct. *Id.* at 818, 102 S.Ct. at 2738.

The objective reasonableness test is a two-part analysis. First, the defendant public official must prove that he was performing duties within the scope of his discretionary authority when the alleged violation occurred. *Hutton v. Strickland,* 919 F.2d 1531 (11th Cir.1990) (citations omitted). A government official may prove that he was acting within the scope of his authority by showing facts and circumstances that would indicate that his actions were part of his normal job duties and were taken in accordance with those duties. *See, e.g., Rich v. Dollar,* 841 F.2d 1558 (11th Cir.1988).

Once the defendant proves that he was acting within his discretionary authority, the burden then shifts to the plaintiff to prove that the defendant did not act in good faith.

---

**20.** Although Eldridge does not raise a First Amendment violation, he agreed with the court at oral argument that a First Amendment violation was an issue in his case.

*Hutton*, 919 F.2d at 1537. The plaintiff may meet this burden by establishing that "the defendant public official's actions 'violated clearly established constitutional law.'" *Id.* (citations omitted). The second prong of the objective reasonableness test has two subparts. First, the court must find that the constitutional law in question was clearly established when the alleged violated occurred. *Id.* at 1538. Second, the court must find that "there is a genuine issue of fact regarding the government official's engaging in conduct violative of the clearly established law." *Id.* "Clearly established" means that "[t]he contours of the [violated] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

> This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but is to say that in light of the pre-existing law the unlawfulness must be apparent.

*Id.* (citations omitted). The Eleventh Circuit has explained that

> [f]or the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law. Qualified immunity is a doctrine that focuses or the actual, on the specific, on the details of concrete cases.

*Lassiter*, 28 F.3d at 1149–50 (citations omitted).

If the plaintiff satisfies his initial burden and shows that the rights that the defendants' conduct allegedly violated were clearly established at the time of the defendants' conduct, the court must then determine whether the plaintiffs have adduced evidence sufficient to create a genuine issue of fact as to whether defendants actually engaged in conduct that violated clearly established law. *Rich*, 841 F.2d at 1564. In this undertaking, the court must draw all inferences of fact in favor of the plaintiff when the plaintiff is the party opposing the motion. *Swint v. City of Wadley, Alabama*, 51 F.3d 988 (11th Cir. 1995).

Morrison, Thigpen, Jones, Herring, and White have claimed the protection of qualified immunity. Eldridge has named each of these defendants in his individual capacity. The court notes that it is undisputed that Morrison, Thigpen, Jones, Herring, and White were acting within the scope of their discretionary authority when they took actions which allegedly caused Eldridge to suffer a deprivation of federally protected rights. The undisputed facts of this case support a finding that the defendants took actions which were in accordance with and part of their normal job duties. *See Rich v. Dollar*, 841 F.2d 1558 (11th Cir.1988). Thus, the court finds that they were acting within the scope of their discretionary authority. With this part of the qualified immunity analysis resolved, the court turns to the issue of whether the plaintiff has met his burden by adducing cases which demonstrate that the alleged actions of the defendants violated clearly established constitutional law and facts which create genuine issue of fact as to whether the defendants engaged in conduct that violated clearly established law.

### i. Equal Protection

The equal protection clause of the Fourteenth Amendment affords Eldridge a right to be free from racial discrimination. *See, e.g., Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). It can hardly be argued that intentional race discrimination in the work place is not a clearly established violation of federally protected rights. *See Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056 (11th Cir.1992). Since racial discrimination in public employment was illegal at the time the defendants allegedly subjected Eldridge to harsher disciplinary punishment for alleged misconduct in the work place and terminated him on account of his race, it is obvious that a reasonable warden or commissioner would have known that such conduct violated Eldridge's right to equal protection of the law.

The final portion of the qualified immunity analysis requires this court to ascertain whether there exists a genuine issue of material fact regarding whether the defendants committed the acts that amount to a violation of the clearly established law. In this circuit, the formulation of the parties' burdens developed for Title VII cases applies to § 1983 racial discrimination claims. *Lee v. Conecuh County Bd. of Educ.*, 634 F.2d 959 (5th Cir.1981). As noted above in the discussion on the Title VII claims, Eldridge has failed to present sufficient evidence to this court from which a reasonable jury could find that the defendants acted in any way that constitutes a violation of Eldridge's clearly established right to be free from race discrimination. He has, plain and simply, failed to produce the necessary evidence. Thus, the defendants' Motion for Summary Judgment is due to be GRANTED to the extent that it applies to Eldridge's race discrimination claim against the defendants in their individual capacities under § 1983.

### ii. First Amendment

The First Amendment affords Eldridge a right to be free from retaliation for protected speech. In addition, the "right to be free from retaliation is clearly established as a first amendment right and as a statutory right under Title VII." *Ratliff v. DeKalb County, Georgia,* 62 F.3d 338 (11th Cir.1995); *see also Tindal v. Montgomery County Comm'n,* 32 F.3d 1535 (11th Cir.1994)(a state may not discharge a public employee in retaliation for protected speech). Thus, a reasonable warden or commissioner would have known that such conduct violated Eldridge's right to equal protection of the law.

In the final portion of the qualified immunity analysis, this court must decide whether a genuine issue of material fact exists regarding whether the defendants committed the acts that amount to a violation of the clearly established law. The Eleventh Circuit has developed a four-part test to determine whether an employer's action constitutes retaliation for protected speech in violation of the First Amendment. *Bryson v. City of Waycross,* 888 F.2d 1562 (11th Cir. 1989). The first part of the *Bryson* test asks if the speech is on a matter of public concern. If the speech only touches on matters of private concern, it warrants no First Amendment protection. The second part of the tests asks if the employee's interest in his speech outweighs the state's interest in promoting efficient public service. If it does not, the First Amendment offers no protection. The third part of the test asks whether the employee's speech played a substantial role in the employee's termination. The fourth part of the test asks if the employee would have been terminated regardless of the protected speech. *See Tindal v. Montgomery Co. Comm'n,* 32 F.3d 1535 (11th Cir. 1994).

Based on the court's analysis above, Eldridge does not meet the third part of this test. He has failed to produce any evidence at all which establishes that his filing of the EEOC charge played any role in his termination. He has offered no evidence to support his claim that the defendants violated his clearly established right to be free from retaliation. Thus, the defendants' Motion for Summary Judgment is due to be GRANTED to the extent that it applies to *Eldridge's* retaliation claim against the defendants in their individual capacities under § 1983.

### 3. Claims Against DOC Defendants in their Official Capacities

Eldridge brought suit against all of the defendants in their official capacities. The claims against these defendants in their official capacities are really suits against the entity of which the named defendants are agents. *See Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166, 105 S.Ct. at 3105. The real party in interest in such suits is the entity itself, and the entity, not the named defendant, will be liable for any damages. *Id.* Thus, the official capacity suits against the five named defendants—Morrison, Thigpen, Jones, Herring, and White—is more properly considered a suit against the Alabama Department of Corrections.

### a. Immunity

 Qualified immunity is unavailable to defendants named in their official capacities. *Id.* at 166–67, 105 S.Ct. at 3105–06. "The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment." *Id.* at 167, 105 S.Ct. at 3106.

 The Eleventh Amendment provides that

[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign state.

U.S. Const. Amend. XI. The Eleventh Amendment also proscribes suits by citizens against their own state. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). It is well established that the states and their agencies are immune from suit for monetary damages. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In fact, the Supreme Court has explained that the Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state, except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). There is no such consent, waiver, or override in this case.

 A court faced with a claim of Eleventh Amendment immunity must first determine whether the plaintiff is suing the state. This often involves deciding whether the entity raising the defense can be considered an "agency or instrumentality" of the state. State law guides this determination. *Mt. Healthy City School Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977). Clearly, the Department of Corrections is a state agency. Therefore, the Department and its officials—Morrison, Thigpen, Jones, Herring, and White—are protected by the Eleventh Amendment from a suit seeking damages. *Toney v. Alabama*, 784 F.Supp. 1542 (M.D.Ala.1992).

To the extent that Eldridge seeks to recover monetary relief from these defendants in their official capacities, the Eleventh Amendment bars this court from exercising jurisdiction to entertain such claims, and summary judgment is due to be GRANTED to the defendants. To the extent that Eldridge seeks prospective injunctive relief from these defendants, the Eleventh Amendment does not present a jurisdictional bar.

### b. Official Policy or Custom

The Department of Corrections, through its officials, can be required to provide prospective injunctive relief only if it is liable. It can only be liable for the acts of its employees which have deprived a plaintiff of federally protected rights if the plaintiff can establish that his injuries were caused by actions taken by the employees pursuant to an official policy or custom of the Department. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To hold the governmental entity liable for the alleged constitutional deprivations of its employees, a plaintiff must prove that an official policy or custom of the governmental entity was the moving force behind the deprivations. *Farred v. Hicks*, 915 F.2d 1530 (11th Cir.1990). In this case, the court need not reach the issue of whether an official policy or custom of the Department of Corrections was the moving force behind the deprivations because the court has already found that Eldridge has presented absolutely no evidence of any constitutional deprivation. Therefore, summary judgment is due to be GRANTED to all defendants in their official capacities sued under § 1983 for prospective injunctive relief.

### C. The § 1985 Claim

Eldridge also brings a cause of action against the defendants under 42 U.S.C. § 1985(3), for conspiracy to deprive him of equal protection of the laws.[21] Specifically,

---

21. In his pleadings, Eldridge alleged that defendants Herring, Jones, and White conspired against him. During his January 24, 1996 deposition, however, Eldridge alleged that Jones and

he claims that they conspired to terminate him. The defendants argue that Eldridge did not establish a prima facie case of conspiracy.

■ The elements of a cause of action under § 1985(3) are

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of person of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624, 627 (11th Cir.1992). More specifically, the second element requires a showing of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 829, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)). In addition, facts detailing the overt acts must be plead specifically. *Arnold v. Board of Educ. of Escambia County, Alabama,* 880 F.2d 305 (11th Cir.1989). The court may consider circumstantial evidence in determining whether these elements have been met. *See Burrell v. Board of Trustees of Georgia Military College,* 970 F.2d 785 (11th Cir.1992).

In this case, Eldridge has provided no evidence in support of his conspiracy claim. Aside from his assertion that certain defendants conspired to terminate him, Eldridge has not even provided other statements concerning the alleged conspiracy. None of the documents which he presented in support of this motion contain information about a conspiracy. Without any supporting evidence,

the court has no choice but to grant summary judgment on this claim.

### D. The § 1986 Claim

■ Eldridge brings a final cause of action under 42 U.S.C. § 1986.[22] Section 1986 creates a cause of action against a person who refuses to take affirmative action in certain circumstances to prevent the commission of an act giving rise to a claim under § 1985. *Courtney v. Reeves,* 635 F.2d 326 (5th Cir.1981). A valid claim under § 1986, however, is premised upon the existence of a valid § 1985 claim. *Id.* Since Eldridge has no claim under § 1985, he cannot have a claim under § 1986. *Hamilton v. Chaffin,* 506 F.2d 904 (5th Cir.1975).

## V. CONCLUSION

For the foregoing reasons it is hereby ORDERED that the defendants' Motion for Summary Judgment filed on March 7, 1996, be GRANTED and that this cause be dismissed with prejudice.

---

White were the only two defendants who conspired against him. During the oral argument held on May 8, 1996, Eldridge represented to the court that Thigpen, Herring, and Jones conspired against him. For the reasons set forth below, the court need not address these discrepancies.

**22.** Eldridge represented at the May, 8, 1996 hearing in this case that the defendants sued under § 1986 are the same defendants sued under § 1985.